Barry I. Levy, Esq.
Michael Vanunu, Esq.
Thomas Paddock, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs, Government Employees Insurance Company,*
*GEICO Indemnity Company, GEICO General Insurance Company*
*and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY,
GEICO GENERAL INSURANCE COMPANY and
GEICO CASUALTY COMPANY,

Docket No.:_____ (      )

Plaintiffs,

**Plaintiff Demands a Trial by Jury**

-against-

BNT-AMS CORP., PREMIATA-MS CORP.,
WENTWORTH MATERIALS INC., DIAMANT
PLUS CORP., VICTOR ZADARENOK, GALINA
PRITCHEP, FEDOR ZADARENOK, GARYXA
RINCON, and JOHN DOE DEFENDANTS "1" – "10",

Defendants.

-------------------------------------------------------------X

## COMPLAINT

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs"), as and for their Complaint against BNT-AMS Corp., Premiata-MS Corp., Wentworth

Materials Inc., Diamant Plus Corp., Victor Zadarenok, Galina Pritchep, Fedor Zadarenok, Garyxa

Rincon and John Doe Defendants "1" – "10" (collectively, the "Defendants"), hereby allege as

follows:

1

## INTRODUCTION

1.      GEICO brings this action to recover more than $415,000.00 that Defendants have wrongfully obtained from GEICO by submitting and causing to be submitted hundreds of fraudulent no-fault insurance charges for medically unnecessary, illusory, and otherwise non-reimbursable durable medical equipment ("DME"), primarily purporting to be osteogenesis stimulators and custom-molded foot inserts (collectively, the "Fraudulent Equipment") through a series of companies known as BNT-AMS Corp. ("BNT-AMS"), Premiata-MS Corp. ("Premiata-MS"), Wentworth Materials Inc. ("Wentworth"), and Diamant Plus Corp. ("Diamant Plus") (collectively, the "Provider Defendants"). The Fraudulent Equipment is alleged have been provided by the Provider Defendants to individuals who claimed to have been involved in automobile accidents in New York and were eligible for coverage under no-fault insurance policies issued by GEICO ("Insureds").

2.      The Provider Defendants are New York Corporations that are purportedly owned by Victor Zadarenok ("V. Zadarenok"), Galina Pritchep ("Pritchep"), Fedor Zadarenok ("F. Zadarenok"), and Garyxa Rincon ("Rincon") (collectively, the "Paper Owner Defendants"). The Paper Owner Defendants, in conjunction with others not presently identifiable to GEICO, devised a fraudulent scheme that involved obtaining prescriptions for medically unnecessary DME from purported healthcare providers (the "Referring Providers") working out of various No-Fault clinics in the New York metropolitan area through the payment of kickbacks and other financial incentives, and using the medically unnecessary prescriptions to submit billing to GEICO and the New York automobile industry that contained numerous fraudulent representations concerning the Fraudulent Equipment allegedly provided to Insureds. Through the fraudulent scheme, Defendants billed GEICO alone more than $1.25 million.  As part of their scheme to extract money from

2

GEICO without detection, Defendants shifted the billing submitted to GEICO from one Provider Defendant to the next and continue to do so through the present day.

3.     By this action, GEICO seeks to recover more than $415,000.00 that has been wrongfully obtained by the Defendants since 2020, and further seeks a declaration that it is not legally obligated to pay reimbursement of more than $600,000.00 in pending No-Fault insurance claims that have been submitted through the Provider Defendants because:

(i)     Defendants billed GEICO for Fraudulent Equipment when they were ineligible to collect No-Fault Benefits because they failed to comply with licensing requirements.

(ii)    Defendants billed GEICO for Fraudulent Equipment pursuant to a fraudulent scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known (i.e. the John Doe Defendants), without regard for genuine patient care, and which included dispensing Fraudulent Equipment that was not medically necessary and which was prescribed pursuant to predetermined fraudulent protocols, including prescriptions secured through collusive arrangements; and

(iii)   The bills for Fraudulent Equipment submitted to GEICO by the Defendants fraudulently misrepresented what was provided to the Insureds – to the extent that any Fraudulent Equipment was provided – and grossly inflated the permissible reimbursement rate that the Defendants could have received for the Fraudulent Equipment.

4.     The Defendants fall into the following categories:

(i)     The Provider Defendants are New York corporations that are used as the billing arm of the fraudulent scheme – they purport to purchase DME from wholesalers, purport to provide the Fraudulent Equipment to automobile accident victims, and bill New York automobile insurance companies, including GEICO, for Fraudulent Equipment.

(ii)    Defendant V. Zadarenok is listed on paper as the owner, operator, and controller of BNT-AMS when, as discussed below, V. Zadarenok works for one of the John Doe Defendants who secretly operated, managed, controlled and financially benefited from the Provider Defendants, and used BNT-AMS to submit bills to GEICO and other New York automobile insurance companies for Fraudulent Equipment purportedly provided to automobile accident victims.

(iii)    Defendant Pritchep is listed on paper as the owner, operator, and controller of Premiata-MS when, as discussed below, Pritchep works for one of the John Doe Defendants who secretly operated, managed, controlled and financially benefited from the Provider Defendants, and used Premiata-MS to submit bills to GEICO and other New York automobile insurance companies for Fraudulent Equipment purportedly provided to automobile accident victims.

(iv)    Defendant F. Zadarenok is listed on paper as the owner, operator, and controller of Wentworth when, as discussed below, F. Zadarenok works for one of the John Doe Defendants who secretly operated, managed, controlled and financially benefited from the Provider Defendants, and used Wentworth to submit bills to GEICO and other New York automobile insurance companies for Fraudulent Equipment purportedly provided to automobile accident victims.

(v)    Defendant Rincon is listed on paper as the owner, operator, and controller of Diamant Plus when, as discussed below, Rincon works for one of the John Doe Defendants who secretly operated, managed, controlled and financially benefited from the Provider Defendants, and used Diamant Plus to submit bills to GEICO and other New York automobile insurance companies for Fraudulent Equipment purportedly provided to automobile accident victims.

(vi)    John Doe Defendants "1" – "10" (collectively, the "John Doe Defendants") are other individuals involved in the fraudulent scheme. Though they are not presently identifiable, they are individuals that: (i) secretly control and profit from the Provider Defendants; (ii) are associated with the Referring Providers and various multi-disciplinary medical offices that purportedly treat high-volume of No-Fault insurance patients (the "Clinics"); (iii) are the sources of prescriptions to the Provider Defendants; and/or (iv) conspired with the Paper Owner Defendants to further the fraudulent schemes against GEICO and other automobile insurers.

5.    As discussed below, Defendants have always known that the claims for Fraudulent Equipment submitted to GEICO were fraudulent because:

(i)    Defendants failed to comply with licensing required to lawfully dispense the Fraudulent Equipment within New York City;

(ii)    The billing submitted to GEICO and other New York automobile insurers was pursuant to a fraudulent scheme designed and implemented to exploit the patients for financial gain, without regard for genuine patient care, and which included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols, including prescriptions secured through collusive arrangements; and

4

     (iii)    The bills for Fraudulent Equipment submitted to GEICO by the Defendants fraudulently misrepresented what was provided to the Insureds – to the extent that any Fraudulent Equipment was provided – and grossly inflated the permissible reimbursement rate that the Defendants could have received for the Fraudulent Equipment.

6.     As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Equipment billed to GEICO through the Provider Defendants.

7.     The charts attached hereto as Exhibits "1" through "4" set forth a representative sample of the fraudulent claims that have been identified to date that the Provider Defendants submitted, or caused to be submitted, to GEICO through the Provider Defendants.

8.     The Defendants' fraudulent scheme against GEICO and the New York automobile insurance industry has been ongoing since 2020 and has continued uninterrupted through the present day, as the Provider Defendants continue to seek collection on pending charges for the Fraudulent Equipment.

9.     As a result of the Defendants' fraudulent scheme, GEICO has incurred damages of more than $415.000.00.

## THE PARTIES

**I.**     **Plaintiffs**

10.     Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue policies of automobile insurance in the State of New York.

**II.**     **Defendants**

11.     John Doe Defendant "1" (hereinafter, the "Secret Owner") is a citizen of New York

and is presently not identifiable. Secret Owner, at all relevant times, has been one the primary drivers of the fraudulent scheme, by secretly controlling and profiting from the Provider Defendants, and conspired and colluded with others, who are not presently identifiable, at various Clinics to obtain prescriptions purportedly issued by the Referring Providers that were used by the Provider Defendants to submit bills to GEICO, and other New York automobile insurers, seeking payment for the Fraudulent Equipment.

12.    Defendant V. Zadarenok resides in and is a citizen of New Jersey and is listed as the "paper" owner of BNT-AMS. V. Zadarenok is not and has never been a licensed healthcare provider.

13.    Defendant Pritchep resides in and is a citizen of New Jersey and is listed as the "paper" owner of Premiata-MS. Pritchep is not and has never been a licensed healthcare provider.

14.    Defendant F. Zadarenok resides in and is a citizen of New Jersey and is listed as the "paper" owner of Wentworth. F. Zadarenok is not and has never been a licensed healthcare provider.

15.    Defendant Rincon resides and is a citizen of New York and is listed as the "paper" owner of Diamant Plus. Rincon is not and has never been a licensed healthcare provider.

16.    Defendant BNT-AMS is a New York corporation with its principal place of business in Brooklyn, New York. BNT-AMS was incorporated on July 9, 2018, and is owned on paper and purportedly operated and controlled by V. Zadarenok. In actuality, the Secret Owner operated, managed, controlled and financially benefited from BNT-AMS and, with the aid of V. Zadarenok, used BNT-AMS as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

17.    Defendant Premiata-MS is a New York corporation with its principal place of

business in Brooklyn, New York. Premiata-MS was incorporated on March 8, 2023, and is owned on paper and purportedly operated and controlled by Pritchep. In actuality, the Secret Owner operated, managed, controlled and financially benefited from Premiata-MS and, with the aid of Pritchep, used Premiata-MS as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

18.    Defendant Wentworth is a New York corporation with its principal place of business in the Bronx, New York. Wentworth was incorporated on April 8, 2024 and is owned on paper and purportedly operated and controlled by F. Zadarenok. In actuality, the Secret Owner operated, managed, controlled and financially benefited from Wentworth and, with the aid of F. Zadarenok, used Wentworth as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

19.    Defendant Diamant Plus is a New York corporation with its principal place of business in the Bronx, New York. Diamant Plus was incorporated on January 9, 2025, and is owned on paper and purportedly operated and controlled by Rincon. In actuality, the Secret Owner operated, managed, controlled and financially benefited from Diamant Plus and, with the aid of Rincon, used Diamant Plus as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

20.    Upon information and belief, the John Doe Defendants "2" – "10" reside in and are citizens of New York and include individuals who are not presently identifiable but (i) are associated with the Clinics, (ii) are unlicensed individuals who unlawfully own and control the Clinics and the relationships with the Referring Providers, and (iii) have conspired with Secret Owner, the Provider Defendants, and/or the Paper Owner Defendants to further the fraudulent scheme committed against GEICO and other New York automobile insurers for their own

7

economic benefit.

## JURISDICTION AND VENUE

21.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

22.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States.  In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

23.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where a substantial amount of the activities forming the basis of the Complaint occurred and is the District where one or more of the Defendants reside.

## ALLEGATIONS COMMON TO ALL CLAIMS

24.     GEICO underwrites automobile insurance in the State of New York.

## I.    An Overview of the Pertinent Laws

### A.    Pertinent Laws Governing No-Fault Insurance Reimbursement

25.     New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need.

26.     Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R.

§§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

27.    In New York, No-Fault Benefits include up to $50,000.00 per Insured for medically necessary expenses that are incurred for healthcare goods and services, including goods for DME. See N.Y. Ins. Law § 5102(a).

28.    In New York, claims for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule (the "New York Fee Schedule").

29.    Pursuant to the No-Fault Laws, healthcare service providers are not eligible to bill for or to collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

30.    For instance, the implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of healthcare services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York or meet any applicable licensing requirement necessary to perform such service in any other state in which such service is performed.

(Emphasis added).

31.    In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that healthcare service providers that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

32.    Title 20 of the City of New York Administrative Code imposes licensing requirements on healthcare providers located within the City of New York which engage in a business which substantially involves the selling, renting, repairing, or adjusting of products for the

disabled, which includes DME.

33.    New York City's Administrative Code requires DME suppliers to obtain a Dealer in Products for the Disabled License ("Dealer in Products License") issued by the New York City Department of Consumer and Worker Protection ("DCWP") in order to lawfully provide DME to the disabled, which is defined as "a person who has a physical or medical impairment resulting from anatomical or physiological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques". See 6 RCNY § 2-271; NYC Admin. Code §20-425.

34.    It is unlawful for any DME supplier to engage in the selling, renting, fitting, or adjusting of products for the disabled within the City of New York without a Dealer in Products License.  See NYC Admin. Code §20-426.

35.    A Dealer in Products License is obtained by filing a license application with the DCWP. The application requires that the applicant identify, among other pertinent information, the commercial address of where the DME supplier is physically operating from.

36.    The license application for a Dealer in Products License also requires the applicant to affirm that they are authorized to complete and submit the application on behalf of the corporate entity seeking a license and that the information contained in the application is true, correct, and complete. The affirmation to the application requires a signature that is made under penalty for false statements under Sections 175.30, 175.35, and 210.45 of New York's Penal Law.

37.    Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for medically necessary goods and services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more

commonly, as an "NF-3").

38.     In the alternative, a healthcare service provider may submit claims using the Healthcare Financing Administration insurance claim form (known as the "HCFA-1500" or "CMS-1500 form").

39.     Pursuant to Section 403 of the New York State Insurance Law, the NF-3 Forms submitted by healthcare service providers to GEICO, and to all other insurers, must be verified subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

40.     Similarly, all HCFA-1500 (CMS-1500) forms submitted by a healthcare service provider to GEICO, and to all other automobile insurers, must be verified by the healthcare service provider subject to the following warning:

> Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

**B.      Pertinent Statutes and Regulations Related to No-Fault Benefits for DME and OD**

41.     Under the No-Fault Laws, No-Fault Benefits can be used to reimburse medically necessary DME that was provided pursuant to a lawful prescription from a licensed healthcare provider. <u>See</u> N.Y. Ins. Law § 5102(a). By extension, DME that was provided without a prescription, pursuant to an unlawful prescription, or by reason of a decision of a layperson or individual not lawfully licensed to provide prescriptions, is not reimbursable under No-Fault.

42.     Under New York State's Public Health Law, "a practitioner may not make a referral to a health care provider for the furnishing of any health or health related items or services where

such practitioner . . . has any of the following financial relationships without disclosing to the patient such financial relationship: . . . (b) a compensation arrangement". See N.Y. P.H.L. § 238-d(1). A practitioner is defined to include "a licensed or registered physician, dentist, podiatrist, chiropractor, nurse, midwife, physician assistant or specialist assistant, physical therapist, or optometrist". See N.Y. P.H.L. § 238(11).

43.     A health care provider is defined to include "a purveyor of health or health related supplies, appliances or equipment", which is a DME supplier such as the Provider Defendants. See N.Y. P.H.L. § 238(6). A compensation arrangement, as referenced in N.Y. P.H.L. § 238-d, includes any remuneration, whether directly, indirectly, overly, covertly, in cash, or in kind that is between a practitioner and a health care provider. See N.Y. P.H.L. § 238-a(5)(a).

44.     DME generally consists of items that can withstand repeated use, and primarily consists of items used for medical purposes by individuals in their homes. For example, DME can include items such as bed boards, cervical pillows, orthopedic mattresses, electronic muscle stimulator units ("EMS units"), osteogenesis stimulators, infrared heat lamps, lumbar cushions, orthopedic car seats, transcutaneous electrical nerve stimulators ("TENS units"), electric moist heating pads (known as thermophores), cervical traction units, whirlpool baths, cryotherapy units, continuous passive motion devices, devices to prevent deep vein thrombosis.

45.     To ensure that each Insured's $50,000.00 in maximum No-Fault Benefits is not artificially depleted by inflated DME charges, the maximum charges that may be submitted by healthcare providers for DME are set forth in the New York State Workers' Compensation Board instituted the New York State Workers' Compensation Durable Medical Equipment Fee Schedule ("DME Fee Schedule"), which is reflected in 12 N.Y.C.R.R. 442.2.

46.     In a June 16, 2004 Opinion Letter entitled "No-Fault Fees for Durable Medical Equipment" the New York State Insurance Department recognized the harm inflicted on Insureds by inflated DME charges:

> [A]n injured person, with a finite amount of No-Fault benefits available, having assigned his rights to a provider in good faith, would have DME items of inflated fees constituting a disproportionate share of benefits, be deducted from the amount of the person's No-Fault benefits, resulting in less benefits available for other necessary health related services that are based upon reasonable fees.

47.     According to the DME Fee Schedule, certain pieces of DME have an established fee payable ("Fee Schedule item"), which is the maximum permissible charge for that specific item of DME based on its Healthcare Common Procedure Coding System ("HCPCS") Code, which provides specific characteristics and requirements that an item of DME must meet in order to qualify for reimbursement under that specific HCPCS Code.

48.     For Fee-Schedule items, Palmetto GBA, LLC ("Palmetto"), a Medicare Administrative Contractor ("MAC") for the Center for Medicare & Medicaid Services ("CMS"), was tasked with analyzing and assigning HCPCS Codes that should be used by DME companies to seek reimbursement for – among other things – Fee Schedule items. The HCPCS Codes and their definitions provide specific characteristics and requirements that an item of DME must meet in order to qualify for reimbursement under a specific HCPCS Code.

49.     The DME Fee Schedule uses HCPCS Codes promulgated by Palmetto to identify the maximum charge for selling specific DME and for renting Fee Schedule items on a weekly basis.

50.     Where a specific piece of DME does not have a fee payable in the Medicaid Fee Schedule ("Non-Fee Schedule item") then the fee payable by an insurer such as GEICO to the

provider shall be the lesser of: (i) 150% of the acquisition cost to the provider; or (ii) the usual and customary price charged to the general public.

51.     Accordingly, when a healthcare provider submits a bill to collect charges from an insurer for DME using either a NF-3 or HCFA-1500 form, the provider represents – among other things – that:

(i)      The provider is in compliance with all significant statutory and regulatory requirements;

(ii)     The provider received a legitimate prescription that was issued in accordance with the requirements of applicable laws and is for reasonable and medically necessary DME from a healthcare practitioner that is licensed to issue such prescriptions;

(iii)    The DME identified in the bill was actually provided to the patient based upon a legitimate prescription identifying medically necessary item(s);

(iv)    The HCPCS Code identified in the bill actually represents the DME that was provided to the patient; and

(v)     The fee sought for DME provided to an Insured was not in excess of the price contained in the Fee Schedule or the standard used for a Non-Fee Schedule item.

## II.     The Defendants' Fraudulent Scheme

### A.     The Provider Defendants' Common Secret Ownership

52.     The John Doe Defendants conspired with the Paper Owner Defendants to implement a complex insurance scheme in which the Provider Defendants were used consecutively and in conjunction with each other to bill GEICO and other New York automobile insurers for millions of dollars in No-Fault Benefits to which they were never entitled to receive.

53.     While the Provider Defendants were formed and listed as being independently owned by one of the Paper Owner Defendants, each of the Provider Defendants were in actuality controlled by the Secret Owner (collectively, with Paper Owner Defendants and Provider

Defendants, the "DME Defendants"), who also profited from the fraudulent scheme committed against GEICO and other New York automobile-insurers.

54.    The Secret Owner was able to secretly control and profit from the Provider Defendants by using each of the Paper Owner Defendants as "straw" owners who would place their name on documents that needed to be filed with the State of New York and City of New York in order to lawfully operate the Provider Defendants.

55.    In keeping with the fact that the Secret Owner actually owned, controlled, and profited from the Provider Defendants, and used the Paper Owner Defendants to further the fraudulent scheme herein, there is significant overlap in the operations of the various Provider Defendants that could only exist through the Secret Owner's involvement.

56.    For example, the Provider Defendants all predominantly billed for the same two items of DME, namely (i) electrical osteogenesis stimulators a/k/a bone growth stimulation devices ("Osteogenesis Stimulators") and (ii) removable, custom molded orthotic shoe inserts ("Custom Orthotic Shoe Inserts").

57.    Notably, for the billing for Osteogenesis Stimulators from all four Provider Defendants, the Defendants never actually provided Osteogenesis Stimulators. Instead, the Provider Defendants purportedly obtained prescriptions from the Referring Provider for pulsed electro-magnetic field therapy devices ("PEMF Devices") and purported to provide Insureds with PEMF Devices but then billed each PEMF Device as a higher-cost Osteogenesis Stimulator in order to maximize the amount of No-Fault Benefits they could obtain from GEICO.

58.    The identical misrepresentation of PEMF Devices, which were purportedly prescribed to the Insureds and provided by the Provider Defendants but were then billed to GEICO

15

as Osteogenesis Stimulators was solely based upon the universal control of all four Provider Defendants by the Secret Owner.

59.    In addition, each of the Provider Defendants billed GEICO based upon prescriptions from virtually identical Referring Providers. Specifically, the Provider Defendants obtained prescriptions from Clinics located at 1100 Pelham Parkway, Bronx, NY ("Pelham Pkwy Clinic") and 719 Southern Boulevard, Bronx, NY ("Southern Blvd Clinic"). Furthermore, Diamant Plus, Wentworth, and Premiata-MS also received prescriptions from a clinic located at 3432 E Tremont Ave, Bronx, NY ("Tremont Ave Clinic").

60.    Furthermore, each of the Provider Defendants used the same billing company, RMA Billing & Consulting, which created and mailed the bills to GEICO on behalf of the Provider Defendants.

61.    The Secret Owner, together with the Paper Owner Defendants, operated the Provider Defendants in the following concurrent and sequential fashion so as to limit the amount of billing submitted from any one of the Provider Defendants and mask the common fraudulent scheme:

    (i)    BNT-AMS billed GEICO for dates of service between November 25, 2020, and June 7, 2024;

    (ii)    Premiata-MS billed GEICO for dates of service between May 29, 2023, and April 3, 2024;

    (iii)    Wentworth billed GEICO for dates of service between June 10, 2024, and May 29, 2025; and

    (iv)    Diamant Plus billed GEICO for dates of service between January 15, 2025, and the present.

62.    In keeping with the fact that the Provider Defendants are actually controlled by the Secret Owner, each of the Provider Defendants used virtually the same delivery receipts in their supporting documentation to GEICO.

63.    For example, bills for Osteogenesis Stimulators from the Provider Defendants included the following virtually identical forms:



**BNT-AMS Corp**
2801 Emmons Ave, Suite 110
Brooklyn, NY 11235
TEL: 718-928-6885

**Supply Delivery Receipt**

| Patient's Name: | |
|---|---|
| DOA: | 03/17/2024 |
| Address: | |
| Phone No: | |

**EQUIPMENT DELIVERED:**

1. WEARABLE PEMF DEVICE
2. (10) ADHESIVES (Kinesiology Tape)

I have received medical supplies and was explained the reason for receiving these supplies and I was also instructed how to use it for my particular condition.



_____ 5-6-24
Patient's Signature          Date

**PREMIATA-MS Corp**
2705 Coney Island Ave,
Brooklyn, NY 11235
TEL: 929-208-7621

**Supply Delivery Receipt**

| Patient's Name: | |
|---|---|
| DOA: | 06/10/2023 |
| Address: | |
| Phone No: | |

**EQUIPMENT DELIVERED:**

1. WEARABLE PEMF DEVICE
2. (10) ADHESIVES (Kinesiology Tape)

I have received medical supplies and was explained the reason for receiving these supplies and I was also instructed how to use it for my particular condition.



_____ 8/30/23
Patient's Signature          Date

17



64.    As another example, bills for Custom Orthotic Shoe Inserts from the Provider

Defendants included the following virtually identical forms:





65. In keeping with the fact that the Secret Owner controls all the Provider Defendants, the handwriting for the patient names in each of the above delivery receipt examples for Custom Orthotic Shoe Inserts contains the same handwriting.

66. In also keeping with the fact that the Provider Defendants are controlled by the Secret Owner, there is a familial relationship between the paper owners for BNT-AMS, Premiata-MS, and Wentworth. Specifically, V. Zadarenok (the paper owner of BNT-AMS) is married to Pritchep (the paper owner of Premiata-MS), and F. Zadarenok (the paper owner of Wentworth) is the son of V. Zadarenok. In addition, all three individuals reside at the same address in New Jersey.

67. Further, as part of Defendants' efforts to mask the Secret Owner's operation and control of the Provider Defendants, GEICO attempted to verify the claims submitted by Defendants by way of requesting examinations under oath, but the Paper Owner Defendants intentionally refused to appear and to provide testimony and/or documents because they would

have been unable to answer key questions about the Provider Defendants' operations and their testimony would have revealed the fraudulent scheme and the secret ownership behind that scheme.

**B.    Overview of the Defendants' Fraudulent Scheme**

68.    The DME Defendants conceived and implemented a complex insurance scheme in which they used the Provider Defendants as vehicles to bill GEICO and other New York automobile insurers for hundreds of thousands of dollars in No-Fault Benefits which Defendants were never entitled to receive.

69.    To maximize the amount of No-Fault Benefits Defendants could receive, the DME Defendants used the Provider Defendants in sequential and overlapping fashion to divide the billing that they were submitting to no-fault insurance carriers, including GEICO.

70.    Through the complex scheme, the DME Defendants used the Provider Defendants to bill and collect No-Fault Benefits from GEICO and other automobile insurers that they were never entitled to collect.  Specifically:

(i)    Between November 25, 2020, and June 7, 2024, BNT-AMS submitted more than $491,000.00 in fraudulent claims to GEICO, has wrongfully obtained more than $156,000.00, and there is more than $196,000.00 in additional fraudulent claims that have yet to be adjudicated but which Defendants continue to seek payment of from GEICO;

(ii)    Between May 29, 2023, and April 3, 2024, Premiata-MS submitted more than $210,000.00 in fraudulent claims to GEICO, has wrongfully obtained more than $3,300.00, and there is more than $199,000.00 in additional fraudulent claims that have yet to be adjudicated but which Defendants continue to seek payment of from GEICO;

(iii)    Between June 10, 2024, and May 29, 2025, Wentworth submitted more than $280,000.00 in fraudulent claims to GEICO, has wrongfully obtained more than $156,000.00, and there is more than $71,000.00 in additional fraudulent claims that have yet to be adjudicated but which Defendants continue to seek payment of from GEICO; and

(iv)    Between January 15, 2025, and the present, Diamant Plus submitted more than $303,000.00 in fraudulent claims to GEICO, has wrongfully obtained more than $99,000.00, and there is more than $174,000.00 in additional fraudulent claims that have yet to be adjudicated but which Defendants continue to seek payment of from GEICO.

71.    The DME Defendants were able to perpetrate the fraudulent scheme against GEICO described below by obtaining prescriptions for Fraudulent Equipment purportedly issued by the Referring Providers because of agreements with John Doe Defendants "2" through "10", who are individuals associated with the Clinics who are not presently identifiable.

72.    As part of this scheme, the Defendants obtained prescriptions for Fraudulent Equipment that were purportedly issued by various Referring Providers who purportedly treated Insureds at the various Clinics.

73.    Notably, none of the DME Defendants marketed or advertised the Provider Defendants to the general public, and the Provider Defendants lacked any genuine retail or office location and operated without any legitimate efforts to attract patients who might need DME or healthcare practitioners who might legitimately prescribe DME.

74.    Similarly, the Paper Owner Defendants did virtually nothing that would be expected of the owner of a legitimate DME supply company to develop its reputation in the medical community or to attract patients who might need DME or healthcare practitioners who might legitimately prescribe DME.

75.    Instead, the DME Defendants entered into collusive agreements with the John Doe Defendants who were associated with both the Clinics and the Referring Providers whereby kickbacks and other financial incentives were paid so that the Provider Defendants would receive large volumes of prescriptions from the Referring Providers in relation to Insureds who were being treated at the Clinics.

76.     Unlike legitimate medical supply companies that dispense a variety of DME devices and healthcare related products, the DME Defendants intentionally targeted the Fraudulent Equipment so they could submit inflated claims for reimbursement to GEICO.

77.     As part of the scheme, and in a way to maximize the amount of money that DME Defendants could obtain from GEICO and other automobile insurers, the DME Defendants regularly misrepresented PEMF Devices in their billing to GEICO as Osteogenesis Stimulators.

78.     By submitting bills to GEICO seeking No-Fault Benefits for Osteogenesis Stimulators based upon a specific HCPCS Code, Provider Defendants falsely represented that they provided Insureds with the particular items associated with the unique HCPCS Code, and that such specific item was medically necessary as determined by a healthcare provider licensed to prescribe DME.

79.     After obtaining the prescriptions for Fraudulent Equipment purportedly issued by the Referring Providers as a result of their collusive relationships with John Doe Defendants "2" – "10", the DME Defendants in turn billed GEICO for: (i) Fraudulent Equipment that was not reasonable or medically necessary; (ii) Fraudulent Equipment at grossly inflated reimbursement rates; and/or (iii) Fraudulent Equipment that was otherwise not reimbursable.

**C.      Defendants' Failure to Comply with Local Licensing Provisions**

80.     As stated above, for a DME supplier to provide DME to automobile accident victims within the City of New York, the DME supplier must obtain a Dealer in Products License by the DCWP.

81.     For DME Defendants to lawfully provide DME to the Insureds identified in Exhibits "1" through "4", the Provider Defendants were required to obtain a Dealer in Products

22

License because an overwhelming majority of the Insureds identified in Exhibits "1" through "4" were located within the City of New York.

82.    As part of the DME Defendants' scheme to defraud GEICO and other Insurers, Defendants sought Dealer in Products Licenses from the DCWP in an effort to have the Provider Defendants appear to be legitimate.

83.    However, the Provider Defendants were not eligible to collect No-Fault Benefits from GEICO, and other automobile insurers, because they were never lawfully licensed by the DCWP to provide DME to Insureds.

84.    For example, the DME Providers were not lawfully licensed by the DCWP because they obtained Dealer in Products licenses through fraud and/or misrepresentations.

85.    As part of obtaining a Dealer in Products License, each of the DME Providers, completed a license application form that required it to identify – among other things – all individuals who have more than a 10% ownership interest in the entity.

86.    Each Dealer in Products License application contains an affirmation to be signed with a penalty for false statements under Section 175.35 of New York's Penal Law.

87.    However, none of the applications for the Dealer in Products Licenses for the Provider Defendants identified the Secret Owner or the ownership interest of the Secret Owner.

88.    Instead, and in support of the fact that DME Defendants scheme to defraud GEICO and other automobile insurers of No-Fault Benefits, each of the applications falsely represented that the Provider Defendants were 100% owned by Paper Owner Defendants.

89.    Accordingly, DME Defendants were never entitled to receive No-Fault Benefits because they failed to comply with all significant statutory and regulatory requirements by

operating as a DME supplier within the City of New York without a valid Dealer in Products License.

90.    In each of the claims identified in Exhibits "1" through "4", DME Defendants fraudulently misrepresented that they were properly licensed with all local statutory and regulatory requirements and were lawfully permitted to provide DME to Insureds when DME Defendants were never eligible to collect No-Fault Benefits in the first instance because the Provider Defendants did not lawfully obtain Dealer in Products Licenses by receiving their Dealer in Products licenses under the false pretenses described above.

**D.    The Fraudulent Scheme – Predetermined Fraudulent Protocols Associated with the Prescriptions**

91.    Defendants were able to obtain prescriptions for Fraudulent Equipment that could be used as a basis to submit billing to GEICO through predetermined fraudulent protocols that were established between and among the DME Defendants, John Doe Defendants, and the Referring Providers.

92.    Through these predetermined fraudulent protocols, the Defendants obtained prescriptions for Fraudulent Equipment that were not medically necessary and were created solely to financially enrich the Defendants, not to genuinely treat the Insureds.

93.    As set forth below, the extent of the Insureds' motor vehicle accidents, physical conditions, and conservative treatment plans demonstrate a pattern of prescribing and dispensing Fraudulent Equipment to the Insureds that were not medically necessary to treat the Insureds post-accident condition.

94.    Virtually all of the Insureds who were prescribed the Fraudulent Equipment identified in Exhibits "1" through "4", were involved in relatively minor and low impact "fender-bender" accidents, to the extent that they were involved in any actual accidents at all.

95. Concomitantly, almost none of the Insureds identified in Exhibits "1" through "4", whom the Referring Providers purported to treat, suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced or purported to experience.

96. In keeping with the fact that many of the Insureds identified in Exhibits "1" through "4" suffered only minor injuries – to the extent that they had any injuries at all – as a result of the relatively minor accidents, many of the Insureds did not seek treatment at any hospital as a result of their accidents.

97. To the extent that the Insureds in the claims identified in Exhibits "1" through "4" did seek treatment at a hospital following their accidents, they virtually always were briefly observed on an outpatient basis and then sent on their way with nothing more serious than a minor soft tissue injury such as a sprain or strain.

98. However, despite virtually all the Insureds being involved in relatively minor and low-impact accidents and only suffering from sprains and strains – to the extent that the Insureds were actually injured – virtually all of the Insureds were subjected to extremely similar treatment and medically unnecessary protocols, including substantially identical prescriptions for Fraudulent Equipment.

99. The Referring Providers issued prescriptions for Fraudulent Equipment to the Insureds identified in Exhibits "1" and "4" pursuant to predetermined fraudulent protocols, not because the Fraudulent Equipment was medically necessary for each Insured based upon his or her individual symptoms or presentations.

100. For example, the predetermined fraudulent protocols at each Clinic (i) included issuing predetermined sets of Fraudulent Equipment that applied to virtually all Insureds, regardless of each patient's individual symptoms or presentation, and (ii) were not based upon

what was medically necessary for each patient. Instead, they were created based upon how the John Doe Defendants, and others including the DME Defendants, could profit from exploiting prescriptions purportedly issued by the Referring Providers.

101.    In other works, no legitimate physician, chiropractor, other licensed healthcare provider, or professional entity would permit prescriptions for Fraudulent Equipment to be issued upon the fraudulent protocols at the various Clinics that were the DME Defendants' referral sources.

102.    In a legitimate setting, when a patient injured in a motor vehicle accident seeks treatment from a healthcare provider, the patient's subjective complaints are evaluated, and the treating provider will direct a specific course of treatment based upon the patient's individual symptoms or presentation.

103.    Furthermore, in a legitimate setting, during the course of a patient's treatment, a healthcare provider may – but not always – prescribe DME that should aid in the treatment of the patient's symptoms.  The specific DME that would be prescribed to aid the treatment of the patient would always directly relate to the patients' individual symptoms or presentation.

104.    In determining whether to prescribe DME to a patient – in a legitimate setting – a healthcare provider is required to evaluate multiple factors, including: (i) whether the specific DME could have any negative effects based upon the patient's physical condition and medical history; (ii) whether the DME is likely to help improve the patient's complained of condition; and (iii) whether the patient is likely to use the DME.  In all circumstances, any prescribed DME will always directly relate to each patient's individual symptoms or presentation.

105.    If a healthcare provider determines that DME is medically necessary after taking into account a patient's individual circumstances and situations, in a legitimate setting, the

26

healthcare provider will indicate in a contemporaneous medical record, such as an evaluation report, what specific DME was prescribed and why.

106.    There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in an automobile accident.

107.    For example, an individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in an automobile accident.

108.    However, here, and in keeping with the fact that the prescriptions provided to the Defendants were for medically unnecessary Fraudulent Equipment obtained as part of predetermined fraudulent protocols to further an insurance scheme, the Referring Providers routinely issued prescriptions for the Fraudulent Equipment to the Insureds without regard to each Insured's individual condition or symptoms.

109.    It is improbable that Insureds involved in different automobile accidents, but who were treated at the same specific No-Fault Clinic, would warrant prescriptions for DME of substantially the same type.

110.    It is improbable – to the point of impossibility – that virtually all of the Insureds identified in Exhibits "1" – "4" who were treated at a specific Clinic would receive virtually identical prescriptions for Fraudulent Equipment, despite being different agents, in different physical conditions, and involved in different motor vehicle accidents.

111.    It is extremely improbable – to the point of impossibility – that a substantial number of Insureds who were involved in the same accident and were purportedly issued Fraudulent Equipment from the Provider Defendants, would require numerous identical items of DME.

27

112.     Here, and in keeping with the fact that the prescriptions provided to the DME Defendants were for medically unnecessary Fraudulent Equipment obtained as part of predetermined fraudulent protocols to further an insurance scheme, the Provider Defendants routinely received prescriptions to fill that were issued to Insureds involved in the same accident and were for substantially identical – if not exactly identical – DME.

113.     Moreover, in a legitimate clinical setting, if a healthcare provider determines that DME is medically necessary after considering a patient's individual circumstances and symptoms, the healthcare provider would document in a contemporaneous medical record, such as an evaluation report, what specific DME was prescribed and why it was medically necessary or how it would help the Insureds.

114.     To the contrary here, to the extent there was a contemporaneously dated evaluation report, the Referring Providers virtually always failed to document the medical necessity of the Fraudulent Equipment and oftentimes failed to even identify the Fraudulent Equipment purportedly prescribed.

115.     Furthermore, and in keeping with the fact that the prescriptions for the Fraudulent Equipment were not medically necessary and were provided pursuant to a predetermined fraudulent protocol, to the extent that Insureds returned for a follow-up examination, the follow-up examination reports never referenced or discussed the Insureds' previously prescribed Fraudulent Equipment.

116.     In a legitimate setting, when a patient returns for a follow-up examination after being prescribed DME, the healthcare provider will inquire – and appropriately report – whether the previously prescribed DME aided the patient's subjective complaints. Such information is

typically included so the healthcare provider can recommend a further course of treatment regarding the previously prescribed DME or adjust the patient's treatment as necessary.

117.    However, the Referring Providers' follow-up examination reports virtually always failed to include any information regarding the Fraudulent Equipment prescribed to the Insureds on a prior date.

118.    For the reasons set forth above, and below, in each of the claims identified in Exhibits "1" through "4", the DME Defendants falsely represented that the Fraudulent Equipment was provided pursuant to prescriptions from healthcare providers for medically necessary DME, and were, therefore, entitled to collect No-Fault Benefits in the first instance, when, the prescriptions were for medically unnecessary Fraudulent Equipment issued as part of the Defendants insurance fraud scheme.

i.    **Collusive Arrangements to Obtain Medically Unnecessary Prescriptions**

119.    To gain access to Insureds so that the DME Defendants could implement and execute their fraudulent scheme and maximize the No-Fault Benefits they could obtain from GEICO and other New York automobile insurers, the DME Defendants entered into unlawful financial agreements with John Doe Defendants "2" – "10" in order to direct prescriptions to the Provider Defendants that were for medically unnecessary Fraudulent Equipment.

120.    Since the inception of the DME Defendants' insurance scheme, the DME Defendants engaged in various collusive arrangements with the John Doe Defendants pursuant to which Defendants paid kickbacks or other financial incentives in exchange for being provided prescriptions for the Fraudulent Equipment that could then be used to support the bills submitted by the Provider Defendants.

121.    However, the collusive nature of the arrangement goes beyond the simple of payment of money or other financial incentives, but includes (i) payment to fictitious businesses associated with the John Doe Defendants, (ii) the ability to secure the prescriptions without ever meeting the Referring Providers, (iii) obtaining the prescriptions directly from the staff at the Clinics, without any communication or involvement by the Insureds, and (iv) providing the Fraudulent Equipment to the Clinic and its staff, with any interaction with the Insureds, and without any interaction with the Provider Defendants or Paper Owner Defendants.

122.    The collusive arrangements allowed the scheme to remain undetected by the Insured and allowed the DME Defendants to access large volumes of prescriptions that in turn afforded them the opportunity to submit charges for Fraudulent Equipment for each Insured to GEICO. But for the collusive arrangements, neither the John Doe Defendants nor the Referring Providers would have had no reason to direct a substantial volume of these medically unnecessary prescriptions for Fraudulent Equipment to the DME Defendants to purportedly fill.

123.    Upon information and belief, the Referring Providers were compensated by the John Doe Defendants, whether financially or through some other economic quid pro quo (e.g. the ability to treat the Insured and independently bill GEICO), for the Referring Providers' willingness to permit prescriptions to be issued in their names and to be given to DME suppliers, including the Provider Defendants, rather than given to the Insureds or to a bona-fide DME/OD supplier, who would likely question its legitimacy.

124.    The collusive relationship between the DME Defendants and John Doe Defendants in relation to the prescriptions are the very kind of arrangement that is prohibited by N.Y. Public Health Law § 238-d, without a specific disclosure to the patient of the financial relationship between the Referring Provider and Provider Defendants. In actuality, no such disclosure required

by Public Health Law § 238-d was ever disclosed to the Insureds identified in Exhibits "1" – "4". Rather, because of the nefarious nature of the relationship between the DME Defendants and the John Doe Defendants, the arrangements between and among the Defendants and Referring Providers was concealed from the Insureds.

125.    As a result of these collusive relationships, the Defendants (rather than the Insured or a bona-fide DME /OD retailer) were given prescriptions which was for medically unnecessary Fraudulent Equipment that was not based upon each Insured's individual need and were boilerplate with the patient names changed.

126.    In keeping with the fact that DME Defendants obtained prescriptions as part of the collusive agreements, the DME Defendants: (i) received prescriptions for the very specified Fraudulent Equipment from Referring Providers operating out of various Clinics; and (ii) upon information and belief, obtained prescriptions for Fraudulent Equipment directly from the Clinics without any communication with or involvement by the Insureds.

127.    In contrast to a bona fide DME supplier, the DME Defendants were willing to obtain prescriptions through collusive arrangements and submit the prescriptions to support their charges to GEICO and other automobile insurers.

128.    The Defendants were able to enter collusive arrangements with the John Doe Defendants in order to obtain prescriptions purportedly issued by the Referring Providers because the Referring Providers operated at Clinics that are actually organized as "one-stop" shops for No-Fault insurance fraud.

129.    These Clinics provide facilities for the Referring Providers, as well as a "revolving door" of medical professional corporations, all geared towards exploiting New York's no-fault

insurance system. The Clinics included, but were not limited to, the Pelham Pkwy Clinic, the Southern Blvd Clinic, and the Tremont Ave Clinic).

130.    Although ostensibly organized to provide a range of healthcare services to Insureds at a single location, many of the Clinics operate under the unlawful ownership and control of unlicensed laypersons, with a revolving door of healthcare providers providing treatment to the Insureds and other patients without any continuity of care

131.    In fact, GEICO has received billing from an ever-changing number of fraudulent healthcare providers at a variety of different Clinics that were the sources of the prescriptions for Defendants, which start and stop operations without any purchase or sale of a "practice", without any legitimate transfer of patient care from one professional to another, and without any legitimate reason for the change in provider name beyond circumventing insurance company investigations and continuing the fraudulent exploitation of New York's no-fault insurance system.

132.    For example, one of the Clinics from which Defendants obtained prescriptions was from the Pelham Pkwy Clinic from which GEICO has received billing from a "revolving door" of over 140 different healthcare providers.

133.    As another example, one of the Clinics from which Defendants obtained prescriptions was from the Tremont Ave Clinic from which GEICO has received billing from a "revolving door" of over 180 different healthcare providers.

134.    Unlicensed laypersons, rather than the healthcare professionals working in the Clinics, create and control the patient base at the Clinics, and direct fraudulent protocols to be used to maximize the generation of revenue for their benefit and the benefit of those with whom they are associated without regard to actual patient care.

ii.      **The Fraudulent Billing for PEMF Devices/Osteogenesis Stimulators**

135.    As part of the fraudulent scheme, the DME Defendants routinely submitted charges for Osteogenesis Stimulators, under HCPCS Code E0747, for charges of $3,300.00 per insured, which was either based upon prescriptions purportedly issued from the Referring Providers.

136.    Although the DME Defendants submitted bills to GEICO seeking No-Fault Benefits for Osteogenesis Stimulators, these bills were based upon prescriptions issued by the Referring Providers either for a PEMF Device or for an Osteogenesis Stimulator.

137.    Osteogenesis Stimulators and PEMF Devices are different types of DME. Osteogenesis Stimulators are devices used to encourage bone growth and accelerate fracture healing.

138.    Various commercial insurers have issued policy bulletins that make clear the use of an Osteogenesis Stimulator is only necessary to heal bone fractures under limited circumstances. In addition, MACs for CMS has published guidance stating that Osteogenesis Stimulators billed under HCPCS Code E0747 are covered only if there is evidence of a fracture where healing has ceased for three or more months prior to starting treatment with the osteogenesis stimulator.

139.    CMS's published guidance specifically states:

A non-spinal electrical osteogenesis stimulator (E0747) is covered only if any of the following criteria are met:

1.    Nonunion of a long bone fracture (see Appendices section) defined as radiographic evidence that fracture healing has ceased for three or more months prior to starting treatment with the osteogenesis stimulator, or
2.    Failed fusion of a joint other than in the spine where a minimum of nine months has elapsed since the last surgery, or
3.    Congenital pseudarthrosis.

Nonunion of a long bone fracture must be documented by a minimum of two sets of radiographs obtained prior to starting treatment with the osteogenesis stimulator, separated by a minimum of 90 days, each including multiple views of the fracture site, and with a written interpretation by a treating practitioner stating that there has been no clinically significant evidence of fracture healing between the two sets of radiographs.

A non-spinal electrical osteogenesis stimulator will be denied as not medically necessary if none of the criteria above are met.

See https://www.cms.gov/medicare-coverage-database/view/lcd.aspx?LCDId=33796.

140.    In contrast to Osteogenesis Stimulators, PEMF Devices are marketed as providing pain relief using Pulsed Electromagnetic Field Therapy. Various commercial insurers have issued policy bulletins that make clear that pulsed electromagnetic stimulation is experimental and investigational

141.    Notwithstanding the experimental and investigational nature of Pulsed Electromagnetic Field therapy and the extremely limited scope of when Osteogenesis Stimulators can be medically necessary, the Defendants repeatedly billed GEICO claiming to provide Osteogenesis Stimulators when – to the extent that they provided any equipment – they provided PEMF Devices.

142.    Once again, the Insureds to whom the DME Defendants purported to provide Fraudulent Equipment were generally involved in relatively minor, low-impact "fender-bender" accidents, to the extent they were involved in any accidents at all.  They did not suffer any significant injuries or health problems as a result of the relatively minor accidents they experienced, did not exhibit any symptoms that would justify the use of an experimental and investigational PEMF Device, and they were not so severely injured that necessitated the use of Osteogenesis Stimulators.

143.    By contrast, the Insureds – to the extent they were actually injured – were purportedly experiencing musculoskeletal pain, including back, shoulder, and/or neck pain, and were purportedly prescribed PEMF Devices or Osteogenesis Stimulators to address those musculoskeletal conditions.

144.    In a legitimate clinical setting, treatment for neck, back, or shoulder pain should begin with conservative therapies such as bed rest, active exercises, physical therapy, heating or cooling modalities, massage, and basic, non-steroidal anti-inflammatory analgesics, such as ibuprofen or naproxen sodium.

145.    If such conservative treatment does not resolve the patient's symptoms, the standard of care can include other conservative treatment modalities such as chiropractic treatment, physical therapy, and the use of pain management medication.  These clinical approaches are well-established.

146.    Virtually all the Insureds who were prescribed a PEMF Device or Osteogenesis Stimulator were already enrolled in a multidisciplinary course of treatment at the Clinics, including physical therapy and chiropractic care.

147.    Despite the Insureds participating in multidisciplinary treatment at the Clinics, including conservative care, the Insureds were systematically prescribed an Osteogenesis Stimulator or PEMF Device to aid in treating their musculoskeletal injuries.

148.    In keeping with the fact that the prescriptions for Osteogenesis Stimulators and PEMF Devices were medically unnecessary and were issued pursuant to predetermined fraudulent protocols, there is no legitimate body of evidence that establishes the effectiveness of PEMF Devices for the treatment of musculoskeletal back, neck, or shoulder pain.

149.    In also keeping with the fact that the prescriptions for Osteogenesis Stimulators and PEMF Devices were medically unnecessary and issued pursuant to predetermined fraudulent protocols, the Referring Providers virtually never indicated in contemporaneous treatment records why the Osteogenesis Stimulators or PEMF Devices were medically necessary for an individual Insured – to the extent the prescriptions were even noted in the first instance.  The Referring

Providers also did not reference or discuss in any follow-up examination the Insureds' previously prescribed PEMF Devices.

150.    In also keeping with the fact that the prescriptions for Osteogenesis Stimulators were not medically necessary and were issued pursuant to predetermined fraudulent protocols, the Insureds who were purportedly provided with Osteogenesis Stimulators did not suffer from bone fractures that had difficulty healing, let alone any bone fractures as a result of the motor vehicle accidents.

151.    In reality, the Osteogenesis Stimulators and PEMF Devices were not medically necessary. Rather they were prescribed pursuant to predetermined fraudulent protocols and unlawful financial arrangements.

152.    Once the DME Defendants obtained the medically unnecessary prescriptions for PEMF Devices and Osteogenesis Stimulators, the DME Defendants always billed GEICO representing that they provided Insureds with Osteogenesis Stimulators that qualified under HCPCS Code E0747.

153.    However, despite billing GEICO for $3,300.00 for each Osteogenesis Stimulator DME Defendants claimed they provided the Insureds, the DME Defendants never actually provided Osteogenesis Stimulators.

154.    Instead, to the extent that any DME was actually provided in response to prescriptions for Osteogenesis Stimulators or PEMF Devices, the DME Defendants provided PEMF Devices.

155.    The Defendants misrepresented that they provided Insureds with Osteogenesis Stimulators in order to fraudulently charge GEICO $3,300.00 per Insured, which was

exponentially more than the DME Defendants could obtain if they billed GEICO for providing PEMF Devices to Insureds, which were cheap low-cost items.

156.    DME Defendants purposefully misrepresented in their bills that they provided Osteogenesis Stimulators under HCPCS Code E0747 in order to maximize the amount of No-Fault Benefits that they could obtain from GEICO and other New York automobile insurers.

157.    In keeping with the fact that DME Defendants did not provide Osteogenesis Stimulators and, to the extent they provided any DME, provided only PEMF Devices, DME Defendants bills to GEICO virtually always included a delivery receipt that identified a PEMF Device was provided to the Insureds.

158.    For example:

(i)     On December 12, 2022, an Insured named JA was involved in a motor vehicle accident and thereafter sought treatment at the Southern Blvd Clinic. On January 26, 2023, Hong Pak, M.D. ("Pak") purportedly issued a prescription to JA for an Osteogenesis Stimulator that was provided to BNT-AMS. Based on the prescription issued to JA, BNT-AMS purportedly provided JA with a "Wearable PEMF Device" as referenced in BNT-AMS's delivery receipt. However, BNT-AMS billed GEICO $3,300.00 for purporting to provide JA with an Osteogenesis Stimulator.

(ii)    On June 30, 2023, an Insured named MN was involved in a motor vehicle accident and thereafter sought treatment at the Pelham Pkwy Clinic. On August 22, 2023, Stella Amanze PA ("PA Amanze") purportedly issued a prescription to MN for an Osteogenesis Stimulator that was provided to Premiata-MS. Based on the prescription issued to MN, Premiata-MS purportedly provided MN with a "Wearable PEMF Device" as referenced in Premiata-MS's delivery receipt. However, Premiata-MS billed GEICO $3,300.00 for purporting to provide MN with an Osteogenesis Stimulator.

(iii)   On September 12, 2023, an Insured named DA was involved in a motor vehicle accident and thereafter sought treatment at the Pelham Pkwy Clinic. On November 21, 2023, PA Amanze purportedly issued a prescription to DA for an Osteogenesis Stimulator that was provided to Premiata-MS. Based on the prescription issued to DA, Premiata-MS purportedly provided DA with a "Wearable PEMF Device" as referenced in Premiata-MS's delivery receipt. However, Premiata-MS billed GEICO $3,300.00 for purporting to provide DA with an Osteogenesis Stimulator.

(iv)     On February 5, 2024, an Insured named HP was involved in a motor vehicle accident and thereafter sought treatment at the Tremont Ave Clinic. On March 19, 2024, John McGee, D.O. ("McGee") purportedly issued a prescription to HP for an Osteogenesis Stimulator that was provided to Premiata-MS. Based on the prescription issued to HP, Premiata-MS purportedly provided JA with a "Wearable PEMF Device" as referenced in Premiata-MS's delivery receipt. However, Premiata-MS billed GEICO $3,300.00 for purporting to provide HP with an Osteogenesis Stimulator.

(v)     On February 29, 2024, an Insured named JA was involved in a motor vehicle accident and thereafter sought treatment at the Tremont Ave Clinic. On April 30, 2024, McGee purportedly issued a prescription to JA for an Osteogenesis Stimulator that was provided to BNT-AMS. Based on the prescription issued to JA, BNT-AMS purportedly provided JA with a "Wearable PEMF Device" as referenced in BNT-AMS's delivery receipt. However, BNT-AMS billed GEICO $3,300.00 for purporting to provide JA with an Osteogenesis Stimulator.

(vi)     On March 17, 2024, an Insured named BA was involved in a motor vehicle accident and thereafter sought treatment at the Tremont Ave Clinic. On April 30, 2024, McGee purportedly issued a prescription to BA for an Osteogenesis Stimulator that was provided to BNT-AMS. Based on the prescription issued to BA, BNT-AMS purportedly provided BA with a "Wearable PEMF Device" as referenced in BNT-AMS's delivery receipt. However, BNT-AMS billed GEICO $3,300.00 for purporting to provide BA with an Osteogenesis Stimulator.

(vii)     On July 29, 2024, an Insured named RC was involved in a motor vehicle accident and thereafter sought treatment at the Pelham Pkwy Clinic. On October 2, 2024, PA Amanze purportedly issued a prescription to RC for an Osteogenesis Stimulator that was provided to Wentworth. Based on the prescription issued to RC, Wentworth purportedly provided RC with a "Wearable PEMF Device" as referenced in Wentworth's delivery receipt. However, Wentworth billed GEICO $3,300.00 for purporting to provide RC with an Osteogenesis Stimulator.

(viii)     On August 18, 2024, an Insured named HM was involved in a motor vehicle accident and thereafter sought treatment at the Pelham Pkwy Clinic. On November 6, 2024, PA Amanze purportedly issued a prescription to HM for an Osteogenesis Stimulator that was provided to Wentworth. Based on the prescription issued to HM, Wentworth purportedly provided HM with a "Wearable PEMF Device" as referenced in Wentworth's delivery receipt. However, Wentworth billed GEICO $3,300.00 for purporting to provide HM with an Osteogenesis Stimulator.

38

(ix)     On August 21, 2024, an Insured named MO was involved in a motor vehicle accident and thereafter sought treatment at the Pelham Pkwy Clinic. On October 16, 2024, PA Amanze purportedly issued a prescription to MO for an Osteogenesis Stimulator that was provided to Wentworth. Based on the prescription issued to MO, Wentworth purportedly provided MO with a "Wearable PEMF Device" as referenced in Wentworth's delivery receipt. However, Wentworth billed GEICO $3,300.00 for purporting to provide MO with an Osteogenesis Stimulator.

(x)      On September 14, 2024, an Insured named MA was involved in a motor vehicle accident and thereafter sought treatment at the Tremont Ave Clinic. On November 4, 2024, McGee purportedly issued a prescription to MA for an Osteogenesis Stimulator that was provided to Wentworth. Based on the prescription issued to MA, Wentworth purportedly provided MA with a "Wearable PEMF Device" as referenced in Wentworth's delivery receipt. However, Wentworth billed GEICO $3,300.00 for purporting to provide MA with an Osteogenesis Stimulator.

(xi)     On January 10, 2025, an Insured named EH was involved in a motor vehicle accident and thereafter sought treatment at the Tremont Ave Clinic. On March 7, 2025, McGee purportedly issued a prescription to EH for an Osteogenesis Stimulator that was provided to Diamant Plus. Based on the prescription issued to EH, Diamant Plus purportedly provided EH with a "Wearable PEMF Device" as referenced in Diamant Plus's delivery receipt. However, Diamant Plus billed GEICO $3,300.00 for purporting to provide EH with an Osteogenesis Stimulator.

(xii)    On January 17, 2025, an Insured named CH was involved in a motor vehicle accident and thereafter sought treatment at the Tremont Ave Clinic. On March 5, 2025, McGee purportedly issued a prescription to CH for an Osteogenesis Stimulator that was provided to Diamant Plus. Based on the prescription issued to CH, Diamant Plus purportedly provided CH with a "Wearable PEMF Device" as referenced in Diamant Plus's delivery receipt. However, Diamant Plus billed GEICO $3,300.00 for purporting to provide CH with an Osteogenesis Stimulator.

(xiii)   On January 6, 2025, an Insured named JM was involved in a motor vehicle accident and thereafter sought treatment at the Southern Blvd Clinic. On February 13, 2025, Jean-Pierre Barakat, M.D. ("Barakat") purportedly issued a prescription to JM for a Wearable PEMF Device that was provided to Diamant Plus. Based on the prescription issued to JM, Diamant Plus purportedly provided JM with a "Wearable PEMF Device" as referenced in Diamant Plus's delivery receipt. However, Diamant Plus billed GEICO $3,300.00 for purporting to provide JM with an Osteogenesis Stimulator.

(xiv)   On February 9, 2025, an Insured named AB was involved in a motor vehicle accident and thereafter sought treatment at the Southern Blvd Clinic. On March 20, 2025, Jean-Pierre Barakat, M.D. ("Barakat") purportedly issued a prescription to AB for a Wearable PEMF Device that was provided to Diamant Plus. Based on the prescription issued to AB, Diamant Plus purportedly provided AB with a "Wearable PEMF Device" as referenced in Diamant Plus's delivery receipt. However, Diamant Plus billed GEICO $3,300.00 for purporting to provide AB with an Osteogenesis Stimulator.

159.    These are only representative examples.

160.    In each of the claims identified in Exhibits "1" through "4" seeking reimbursement under HCPCS Code E0747, DME Defendants falsely represented that Fraudulent Equipment was provided pursuant to prescriptions from healthcare providers for medically necessary DME and were, therefore, eligible to collect No-Fault Benefits in the first instance, when, in fact, the prescriptions were for medically unnecessary Fraudulent Equipment issued pursuant to predetermined fraudulent protocols and provided to DME Defendants pursuant agreements with others who are not presently identifiable.

161.    In addition, each of the claims in Exhibits "1" through "4" seeking reimbursement under HCPCS Code E0747, DME Defendants falsely represented that they provided Insureds with Osteogenesis Stimulators when, to the extent that any Fraudulent Equipment was provided, DME Defendants provided PEMF Devices.

### iii.    The Fraudulent Billing for Custom Orthotic Shoe Inserts

162.    In addition to billing for Osteogenesis Stimulators, DME Defendants routinely submitted, or caused to be submitted, bills to GEICO through each of the Provider Defendants that sought reimbursement for purported Custom Orthotic Shoe Inserts.

163.    For each Insured who purportedly received a Custom Orthotic Shoe Insert, the Provider Defendants billed GEICO $262.44 per insert under HCPCS Code L3000, which represents that the Insured was provided with a "Foot insert, removable, molded to patient model,

40

UCB type, Berkeley shell, each."

164.     The type of orthotic shoe insert that falls under HCPCS Code L3000 is a special custom-made shell that is typically used to treat children to address foot deformities, not musculoskeletal injuries that are based upon a motor vehicle accident.

165.     In fact, in a legitimate setting, the customized foot insert that falls under HCPCS Code L3000 is wholly inappropriate for use in treating acute injuries, such as those that Insureds would experience when involved in low impact "fender-bender" accidents.

166.     Custom Orthotic Shoe Inserts, such as the ones that were purportedly provided by the Defendants to the Insureds identified in Exhibits "1" – "4", are only medically necessary in certain limited situations.

167.     For example, the MACs have published guidance stating that Custom Orthotic Shoe Inserts billed under HCPCS Code L3000 are covered only if a patient is suffering from Diabetes, or if the orthotic device is an integral part of a leg brace. See: https://www.cms.gov/medicare-coverage-database/view/article.aspx?articleId=52481

168.     Similarly, various commercial insurers issued policy bulletins that make clear the use of Custom Orthotic Shoe Inserts are only necessary under limited circumstances.

169.     Notwithstanding the limited accepted uses for Custom Orthotic Shoe Inserts, the Defendants repeatedly billed for purportedly providing such devices when the Insureds did not suffer from diabetes or were in need of Custom Orthotic Shoe Inserts as part of a leg brace.

170.     As with the other Fraudulent Equipment billed by the Provider Defendants, the Custom Orthotic Shoe Inserts were not medically necessary and were provided – to the extent provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds.

171.    The Insureds to whom DME Defendants purported to provide Custom Orthotic Shoe Inserts were generally involved in relatively minor, low-impact "fender-bender" accidents, to the extent they were involved in any accidents at all.  They did not suffer any significant injuries or health problems as a result of the relatively minor accidents they experienced, and did not exhibit any symptoms that would justify the use of Custom Orthotic Shoe Inserts.

172.    In keeping with the fact that the Custom Orthotic Shoe Inserts were not medically necessary and were prescribed pursuant to predetermined fraudulent protocols, the Referring Providers' examination reports make no mention of diabetes for any Insured who was prescribed a Custom Molded Foot Orthotic.

173.    Instead, the examination reports and prescription forms typically indicated that the Insureds were experiencing some form of musculoskeletal pain.

174.    In keeping with the fact that the Custom Orthotic Shoe Inserts were not medically necessary and were prescribed pursuant to predetermined fraudulent protocols, the medical records associated with the prescriptions fail to mention diabetes, or any other facts that would support the medical necessity for Insureds to be issued Custom Orthotic Shoe Inserts under HCPCS Code L3000.

175.    The only explanation given for the issuance of purported Custom Orthotic Shoe Inserts are the following statement contained in every medical record "Patient was casted for custom molded orthotics to stabilize his/her lower back, leg and ankle and prevent recurrence of symptoms".

176.    In reality, the prescribed Custom Orthotic Shoe Inserts were not medically necessary and were prescribed pursuant to predetermined fraudulent protocols because such use of Custom Orthotic Shoe Inserts are not for the treatment of musculoskeletal pain exhibited by the

Insureds identified in Exhibits "1" – "4".

177.    In further keeping with the fact that the Custom Orthotic Shoe Inserts were not medically necessary and were prescribed pursuant to predetermined fraudulent protocols, virtually every Insured who reportedly received a Custom Orthotic Shoe Insert was given an Insert for both feet, regardless of their ages, physical condition, how they experienced the impact from different locations in the vehicle, and the symptoms they complained of.

178.    In reality, the Insureds were purportedly prescribed Custom Orthotic Shoe Inserts to treat their musculoskeletal pain, which was not to treat the Insureds individual conditions but issued as part of larger predetermined fraudulent protocols made to maximize the amount of No-Fault Benefits that DME Defendants could obtain.

179.    In keeping with the facts that the prescriptions for Custom Orthotic Shoe Inserts were medically unnecessary and issued pursuant to predetermined fraudulent protocols, the prescriptions were accompanied by boilerplate orthotic manufacturer forms that are virtually identical.

180.    For example, the orthotic manufacturer forms associated with virtually all of the bills from Premiata-MS, Diamant Plus, and Wentworth, along with a substantial majority of the bills from BNT-AM belonged to an orthotic company named TNTortholab, that purports to manufacture custom foot orthotics.

181.    As part of DME Defendants predetermined fraudulent protocols, virtually all of the TNTortholab forms associated with the prescriptions for Custom Orthotic Shoe Inserts that were issued to women contained the exact same check-marked boxes for the type of orthotic needed.

182.    Similarly, virtually all of the TNTortholab forms associated with the prescriptions for Custom Orthotic Shoe Inserts that were issued to men contained the exact same check-marked

boxes for the type of orthotic needed.

183.    As part of the fraudulent scheme, and in addition to obtaining medically unnecessary prescriptions pursuant to predetermined fraudulent protocols, to the extent that the DME Defendants provided the Insureds with any shoe inserts, DME Defendants fraudulently misrepresented what was provided in their billing to GEICO.

184.    In each of the bills submitted to GEICO, DME Defendants represented that they provided Insureds with Custom Orthotic Shoe Inserts under HCPCS Code L3000.

185.    Guidelines issued by the American Podiatric Medical Association ("APMA"), American Orthotic and Prosthetic Association ("AOPA"), and Prescription Footwear Association ("PFA") describe the requirements for Custom Orthotic Shoe Inserts that fall under HCPCS code L3000:

> This type of device is fabricated from a three-dimensional model of the patient's own foot (e.g. cast, foam impression, or virtual true 3-D digital image). This type of orthotic is a functional device (reducing pathological forces) which has a molded heel cup and trim lines with substantial height to provide both medial and lateral directive forces to control the hind and fore foot. It may also have intrinsic or extrinsic posts designed to control foot motion. This device is made of a sufficiently rigid material to control function and reduce pathological forces. HCPCS code L3000 includes additions such as postings, padded top covers, soft tissue supplements, balance padding and lesion or structure accommodations. Other additions may be required as well.

186.    However, to the extent that any orthotic inserts were provided to the Insureds, the orthotic inserts were not Custom Orthotic Shoe Inserts that qualified under HCPCS Code L3000.

187.    For example, while the HCPCS Code L3000 applies to Custom Orthotic Shoe inserts for individuals who suffer from diabetes, the TNTortholab forms submitted with DME Defendants bills never checked off the box "Diabetic" or "Diabetic Filler".

188.    As another example, HCPCS Code L3000 applies to an orthotic that "is made of a sufficiently rigid material" while the TNTortholab forms indicated that the Custom Orthotic Shoe

Inserts ordered were for a "Semi-Flex" item, and the "Rigid" option was not checked.

189.    As another example, all of the TNTortholab forms indicated that the material for the Custom Orthotic Shoe Inserts were to be "Spenco". However, Custom Orthotic Shoe Inserts that were made of Spenco fall under HCPCS Code L3001, which has a maximum reimbursement rate in the Fee Schedule that is more than 50% less than the reimbursement for HCPCS Code L3000 (the rate that the Defendants billed GEICO).

190.    In reality, DME Defendants falsely misrepresented in their bills that they provided Insureds with Custom Orthotic Shoe Inserts that qualified under HCPCS Code L3000, when DME Defendants never provided the Insureds with such items.

191.    DME Defendants purposefully misrepresented in their bills to GEICO that they provided Insureds with Custom Orthotic Shoe Inserts under HCPCS Code L3000 to maximize the amount of No-Fault benefits they could obtain as HCPCS Code L3000 has the highest reimbursement for a Custom Orthotic Shoe Insert.

192.    In reality, to the extent that DME Defendants provided any shoe orthotics to the Insureds, the shoe orthotics were cheap items that were reimbursable, if medically necessary, at a fraction of the rate that was billed by Defendants to GEICO.

193.    As with the other Fraudulent Equipment billed by DME Defendants, the Custom Orthotic Shoe Inserts were not medically necessary and were provided – to the extent provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds.

## III.    The Fraudulent Billing the Provider Defendants Submitted or Caused to be Submitted to GEICO

194.    To support their fraudulent charges, Defendants systematically submitted or caused to be submitted hundreds of NF-3 forms or HCFA-1500 forms to GEICO through and in the names

of the Provider Defendants, seeking payment for the Fraudulent Equipment.

195.    The NF-3 forms, and treatment reports that the Defendants submitted or caused to

be submitted to GEICO were false and misleading in the following material respects:

(i)    The NF-3 forms, HCFA-1500 forms, treatment reports, prescriptions, and delivery receipts uniformly misrepresented to GEICO that DME Defendants lawfully provided reasonable and medically necessary DME to Insureds and therefore were entitled to receive No-Fault Benefits. In fact, Defendants were not entitled to receive No-Fault Benefits because, to the extent that Defendants provided any of Fraudulent Equipment, they were not properly licensed by the DCWP as they falsified the information contained in their application for a Dealer for Products License.

(ii)    The NF-3 forms, HCFA-1500 forms, and the prescriptions uniformly misrepresented to GEICO that the DME Defendants provided Fraudulent Equipment pursuant to legitimate prescriptions from licensed healthcare providers for reasonable and medically necessary DME and therefore were entitled to receive No-Fault Benefits. In fact, the DME Defendants were not entitled to receive No-Fault Benefits because, to the extent that the DME Defendants provided any Fraudulent Equipment, it was pursuant to a fraudulent scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols.

(iii)    The NF-3 forms, HCFA-1500 forms, and the prescriptions uniformly misrepresented to GEICO that the DME Defendants provided Fraudulent Equipment pursuant to legitimate prescriptions from licensed healthcare providers for reasonable and medically necessary DME and therefore were entitled to receive No-Fault Benefits. In fact, the DME Defendants were not entitled to receive No-Fault Benefits because, to the extent that the DME Defendants provided any Fraudulent Equipment, it was pursuant to a fraudulent scheme that included dispensing Fraudulent Equipment based on prescriptions secured through collusive arrangements with the John Doe Defendants.

(iv)    The NF-3 forms, HCFA-1500 forms, treatment reports, prescriptions, and delivery receipts uniformly misrepresented to GEICO that DME Defendants provided Fraudulent Equipment pursuant to prescriptions from licensed healthcare providers for reasonable and medically necessary DME, and therefore were eligible to receive No-Fault Benefits.  In fact, the DME Defendants were not entitled to receive No-Fault Benefits because – to the extent that the DME Defendants provided any Fraudulent Equipment to the

Insureds – the Fraudulent Equipment did not meet the specific requirements for the HCPCS Codes identified in the NF-3 and/or HCFA-1500 forms.

**IV.    The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

196.    The DME Defendants were legally and ethically obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

197.    To induce GEICO to promptly pay the fraudulent charges for Fraudulent Equipment, Defendants systemically concealed their fraud and went to great lengths to accomplish this concealment.

198.    Specifically, they knowingly misrepresented that they were lawfully licensed by the City of New York as they never complied with regulations requiring the Provider Defendants to obtain a Dealer in Products License from the DCWP because they falsely indicated, under penalty for false statements, in the application for a Dealer in Products License of the Secret Owners ownership interest for each of the DME Providers, and concealed these misrepresentations in order to submit bills to GEICO and prevent GEICO from discovering that Fraudulent Equipment were billed to GEICO for financial gain.

199.    The DME Defendants also knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the provision of the Fraudulent Equipment was pursuant to an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the DME Defendants and others not presently known (i.e. the John Doe Defendants), without regard for genuine patient care.

200.    Additionally, the DME Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the provision of the Fraudulent Equipment was pursuant to an insurance fraud scheme, which included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols, including

47

prescriptions secured through collusive arrangements.

201.    Furthermore, the DME Defendants knowingly misrepresented and concealed facts to prevent GEICO from discovering that the HCPCS Codes for Fraudulent Equipment contained in the bills submitted by the Provider Defendants to GEICO did not accurately reflect the type of Fraudulent Equipment purportedly provided to the insureds.

202.    The billing and supporting documentation submitted by the Provider Defendants, when viewed in isolation, did not reveal its fraudulent nature.

203.    GEICO maintains standard office practices and procedures that are designed to and do ensure that no-fault claim denial forms or requests for additional verification of no-fault claims are properly addressed and mailed in a timely manner in accordance with the No-Fault Laws

204.    In accordance with the No-Fault Laws, and GEICO's standard office practices and procedures, GEICO either: (i) timely and appropriately denied the pending claims for No-Fault Benefits submitted through Defendants; or (ii) timely issued requests for verification with respect to all of the pending claims for No-Fault Benefits submitted through Defendants (yet GEICO failed to obtain compliance with the requests for additional verification), and, therefore, GEICO's time to pay or deny the claims has not yet expired.

205.    The DME Defendants hired law firms to pursue collection of the charges associated with the Fraudulent Equipment from GEICO and other automobile insurers.  Those law firms routinely filed expensive and time-consuming litigation against GEICO and other insurers if the charges were not promptly paid in full.

206.    DME Defendants' collection efforts through the filing and prosecution of numerous separate No-Fault collection proceedings, which proceedings may continue for years, is an essential part of their fraudulent scheme, since they know it is impractical for an arbitrator or civil

court judge in a single No-Fault arbitration or civil court proceeding, typically involving a single bill, to uncover or address Defendants' large-scale, complex fraud scheme involving numerous patients across numerous different clinics located throughout the metropolitan area. The purpose of the mass filings of no-fault collection proceedings is to monetize the fraud and further perpetuate the RICO enterprise.

207.    In fact, Defendants continue to have legal counsel pursue collection against GEICO and other insurers without regard for the fact that the Defendants have been engaged in widespread fraud.

208.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days.  The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to, and did cause GEICO to rely upon them.  As a result, GEICO incurred damages of more than $415,000.00 based upon the fraudulent charges.

209.    Based upon the Provider Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

**FIRST CAUSE OF ACTION**
**Against the Provider Defendants**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

210.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

211.    There is an actual case in controversy between GEICO and the Provider Defendants regarding more than $600,000.00 in fraudulent pending billing that has been submitted to GEICO in the names of the Provider Defendants.

212.    The Provider Defendants have no right to receive payment for any pending bills submitted to GEICO because Defendants did not comply with all local licensing laws as the DME Providers falsified their business addresses and the identities of the corporate owners on the applications for Dealer in Products Licenses, and thus, were not properly lawfully licensed by the DCWP as required by regulations from the City of New York.

213.    The Provider Defendants also have no right to receive payment for any pending bills submitted to GEICO because the bills submitted to GEICO for Fraudulent Equipment were based not upon medical necessity but were submitted as part of an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Provider Defendants and others not presently known (i.e. the John Doe Defendants), without regard for genuine patient care.

214.    The Provider Defendants have no right to receive payment for any pending bills submitted to GEICO because the bills submitted to GEICO for Fraudulent Equipment were pursuant to an insurance fraud scheme, which included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols, including prescriptions secured through collusive arrangements.

215.    The Provider Defendants have no right to receive payment for any pending bills submitted to GEICO because – to the extent the Provider Defendants actually provided any Fraudulent Equipment – the Provider Defendants fraudulently misrepresented the type of

Fraudulent Equipment purportedly provided to Insureds as the HCPCS Codes identified in the bills did not accurately represent the Fraudulent Equipment provided to the Insureds.

216.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the Provider Defendants have no right to receive payment for any pending bills submitted to GEICO under the names of BNT-AMS, Premiata-MS, Wentworth, and Diamant Plus.

## SECOND CAUSE OF ACTION
### Against V. Zadarenok, Pritchep, F. Zadarenok, Rincon and John Doe Defendant "1" (Violation of RICO, 18 U.S.C. § 1962(c))

217.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

218.    BNT-AMS, Premiata-MS, Wentworth, and Diamant Plus together constitute an association-in-fact "enterprise" (the "DME Provider Enterprise"), as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

219.    The members of the DME Provider Enterprise are and have been associated through time, joined in purpose, and organized in a manner amenable to hierarchal and consensual decision making, with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose. Specifically, BNT-AMS, Premiata-MS, Wentworth, and Diamant Plus are ostensibly independent businesses – with different names and tax identification numbers – that were used as vehicles to achieve a common purpose – namely, to facilitate the submission of fraudulent charges to GEICO.

220.    The DME Provider Enterprise operated under four separate names and tax identification numbers in order to limit the time period and volume of bills submitted under any individual name, in an attempt to avoid attracting the attention and scrutiny of GEICO and other

51

insurers to the volume of billing and the pattern of fraudulent charges originating from any one business. Accordingly, the carrying out of this scheme would be beyond the capacity of each member of the DME Provider Enterprise acting singly or without the aid of each other.

221.    The DME Provider Enterprise is distinct from and has an existence beyond the pattern of racketeering that is described herein, namely by recruiting, employing, overseeing and coordinating many individuals who have been responsible for facilitating and performing a wide variety of administrative and ostensibly professional functions beyond the acts of mail fraud and wire fraud (i.e., the submission of the fraudulent bills to GEICO and other insurers), by creating and maintaining patient files and other records, by recruiting and supervising personnel, by negotiating and executing various contracts and/or illegal verbal agreements, by maintaining the bookkeeping and accounting functions necessary to manage the receipt and distribution of the insurance proceeds, and by retaining collection lawyers whose services also were used to generate payments from insurance companies to support all of the aforesaid functions.

222.    V. Zadarenok, Pritchep, F. Zadarenok, Rincon, and John Doe Defendant "1" have been employed by and/or associated with the DME Provider Enterprise.

223.    V. Zadarenok, Pritchep, F. Zadarenok, Rincon, and John Doe Defendant "1" knowingly have conducted and/or participated, directly or indirectly, in the conduct of the DME Provider Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, and federal wire fraud statute 18 U.S.C. § 1343, based upon the use of the United States mails and interstate wires to submit or cause to be submitted hundreds of fraudulent charges seeking payments that the DME Provider Enterprise was not eligible to receive under the No-Fault Laws, because: (i) none of the Providers Defendants were lawfully licensed by the DCWP as they knowingly falsified information on their applications for a

Dealer in Products License; (ii) the bills submitted to GEICO for the provision of Fraudulent Equipment were not based upon medical necessity but were submitted pursuant to an insurance fraud scheme that was designed and implemented to exploit patients for financial gain so as to benefit the Defendants and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols; (iii) the Fraudulent Equipment was dispensed based on prescriptions secured through collusive arrangements with the John Doe Defendants; and (iv) to the extent that the Provider Defendants actually provided Fraudulent Equipment to the Insureds, the bills to GEICO fraudulently misrepresented the type of DME provided to Insureds as the HCPCS Codes identified in the bills did not accurately represent the Fraudulent Equipment provided. The fraudulent billings and corresponding mailings/interstate wire transmissions submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibits "1" through "4".

224.    The DME Provider Enterprise's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail and wire fraud are the regular ways in which V. Zadarenok, Pritchep, F. Zadarenok, Rincon, and John Doe Defendant "1" operated the DME Provider Enterprise, inasmuch as the DME Provider Enterprise never operated as legitimate DME suppliers, never was eligible to bill for or collect No-Fault Benefits and acts of mail and wire fraud therefore were essential in order for the DME Provider Enterprise to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail and wire fraud and the use of multiple TIN numbers and entities implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt

collection on the fraudulent billing submitted through the DME Provider Enterprise to the present day.

225.    The DME Provider Enterprise is engaged in inherently unlawful acts inasmuch as it continues to both submit fraudulent billing to GEICO and attempt collection on fraudulent billing submitted to GEICO and other New York automobile insurers. These inherently unlawful acts are taken by the DME Provider Enterprise in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

226.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $415,000.00 pursuant to the fraudulent bills submitted in furtherance of the DME Provider Enterprise.

227.    By reason of its injury, Plaintiffs are entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
**Against the Paper Owner Defendants and the John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

228.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

229.    The DME Provider Enterprise is an association-in-fact "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

230.    The Paper Owner Defendants and the John Doe Defendants are employed by and/or associated with the DME Provider Enterprise.

231.    The Paper Owner Defendants and the John Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the DME Provider Enterprise's affairs through a pattern of racketeering activity consisting of

repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, and federal wire fraud statute, 18 U.S.C. § 1343, based upon the use of the United States mails and interstate wires to submit or cause to be submitted fraudulent charges seeking payments that the DME Provider Enterprise was not eligible to receive under the No-Fault Laws because: (i) none of the Providers Defendants were lawfully licensed by the DCWP as they knowingly falsified information on their applications for a Dealer in Products License; (ii) the bills submitted to GEICO for the provision of Fraudulent Equipment were not based upon medical necessity but were submitted pursuant to an insurance fraud scheme that was designed and implemented to exploit patients for financial gain so as to benefit the Defendants and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols; (iii) the Fraudulent Equipment was dispensed based on prescriptions secured through collusive arrangements with the John Doe Defendants; and (iv) to the extent that the Provider Defendants actually provided Fraudulent Equipment to the Insureds, the bills to GEICO  fraudulently misrepresented the type of DME provided to Insureds as the HCPCS Codes identified in the bills did not accurately represent the Fraudulent Equipment provided.  The fraudulent billings and corresponding mailings/interstate wire transmissions submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibits "1" through "4".

232.    The Paper Owner Defendants and the John Doe Defendants knew of, agreed to, and acted in furtherance of the common overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of fraudulent charges to GEICO.

233.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $415,000.00 pursuant to the fraudulent bills submitted

in furtherance of the DME Provider Enterprise.

234.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**FOURTH CAUSE OF ACTION**
**Against V. Zadarenok and John Doe Defendant "1"**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

235.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

236.    BNT-AMS is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

237.    V. Zadarenok and John Doe Defendant "1" knowingly conducted and/or participated, directly or indirectly, in the conduct of BNT-AMS's affairs through a pattern of racketeering activity consisting of repeated violations of the mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges seeking payments that BNT-AMS was not eligible to receive under the No-Fault Laws, because: (i) BNT-AMS was not lawfully licensed by the DCWP as it knowingly falsified information on its application for a Dealer in Products License; (ii) the bills submitted to GEICO for the provision of Fraudulent Equipment from BNT-AMS were not based upon medical necessity but were submitted pursuant to an insurance fraud scheme that was designed and implemented to exploit patients for financial gain so as to benefit the Defendants and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols; (iii) the Fraudulent Equipment was dispensed based on prescriptions secured through

collusive arrangements with the John Doe Defendants; and (iv) to the extent that BNT-AMS actually provided Fraudulent Equipment to the Insureds, the bills to GEICO fraudulently misrepresented the type of DME provided to Insureds as the HCPCS Codes identified in the bills did not accurately represent the Fraudulent Equipment provided. The fraudulent billings and corresponding mailings/interstate wire transmissions submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "2".

238.    BNT-AMS's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in which the V. Zadarenok and John Doe Defendant "1" operated BNT-AMS, inasmuch as BNT-AMS never operated as a legitimate DME supplier, never was eligible to bill for or collect No-Fault Benefits and acts of mail and wire fraud therefore were essential in order for BNT-AMS to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail and wire fraud implies a threat of continued criminal activity, as does the fact that BNT-AMS continues to attempt collection on the fraudulent billing submitted through BNT-AMS to the present day.

239.    BNT-AMS is engaged in inherently unlawful acts inasmuch as it continues to both submit fraudulent billing to GEICO and attempt collection on fraudulent billing submitted to GEICO and other New York automobile insurers. These inherently unlawful acts are taken by BNT-AMS in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

240.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $156,000.00 pursuant to the fraudulent bills submitted in furtherance of the BNT-AMS Enterprise.

241.    By reason of its injury, Plaintiffs are entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**FIFTH CAUSE OF ACTION**
**BNT-AMS, V. Zadarenok, and John Doe Defendant "1"**
**(Common Law Fraud)**

242.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

243.    BNT-AMS, V. Zadarenok, and John Doe Defendant "1" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Equipment.

244.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, that BNT-AMS had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact BNT-AMS was not lawfully licensed as it knowingly falsified the business owner information on its application for a Dealer in Products license; (ii) in every claim, that the Fraudulent Equipment dispensed was for reasonable and medically necessary DME when in fact the Fraudulent Equipment was dispensed pursuant to an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and

prescribed pursuant to predetermined fraudulent protocols; (iii) in every claim, that the Fraudulent Equipment dispensed pursuant to a legitimate prescription from a licensed healthcare provider, when in fact the Fraudulent Equipment was dispensed based on prescriptions secured through collusive arrangements with the John Doe Defendants; and (iv) in every claim, that the Fraudulent Equipment provided to the Insureds accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when, to the extent that any Fraudulent Equipment was actually provided, the Fraudulent Equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO. A representative sample of the fraudulent billings and corresponding mailings submitted to GEICO identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

245.    BNT-AMS, V. Zadarenok, and John Doe Defendant "1" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through BNT-AMS that were not compensable under the No-Fault Laws.

246.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $156,000.00 pursuant to the fraudulent bills submitted by BNT-AMS, V. Zadarenok, and John Doe Defendant "1" through BNT-AMS.

247.    The extensive fraudulent conduct by BNT-AMS, V. Zadarenok, and John Doe Defendant "1" demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

248.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## SIXTH CAUSE OF ACTION
### Against BNT-AMS, V. Zadarenok, and John Doe Defendant "1"
### (Unjust Enrichment)

249.   GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

250.   As set forth above, BNT-AMS, V. Zadarenok, and John Doe Defendant "1" engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

251.   When GEICO paid the bills and charges submitted by or on behalf of BNT-AMS for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the improper, unlawful, and/or unjust acts BNT-AMS, V. Zadarenok, and John Doe Defendant "1".

252.   BNT-AMS, V. Zadarenok, and John Doe Defendant "1" have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that BNT-AMS, V. Zadarenok, and John Doe Defendant "1" voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

253.   BNT-AMS, V. Zadarenok, and John Doe Defendant "1"'s retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

254.   By reason of the above, BNT-AMS, V. Zadarenok, and John Doe Defendant "1" have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $156,000.00.

## SEVENTH CAUSE OF ACTION
### Against Premiata-MS, Pritchep, and John Doe Defendant "1"
### (Common Law Fraud)

255.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

256.    Premiata-MS, Pritchep, and John Doe Defendant "1" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Equipment.

257.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, that Premiata-MS had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact Premiata-MS was not lawfully licensed as it knowingly falsified the business owner information on its application for a Dealer in Products license; (ii) in every claim, that the Fraudulent Equipment dispensed was for reasonable and medically necessary DME when in fact the Fraudulent Equipment was dispensed pursuant to an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols; (iii) in every claim, that the Fraudulent Equipment dispensed pursuant to a legitimate prescription from a licensed healthcare provider, when in fact the Fraudulent Equipment was dispensed based on prescriptions secured through collusive arrangements with the John Doe Defendants; and (iv) in every claim, that the Fraudulent Equipment provided to the Insureds accurately reflected the HCPCS Codes contained in the bills submitted to

GEICO when, to the extent that any Fraudulent Equipment was actually provided, the Fraudulent Equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO.

258.    Premiata-MS, Pritchep, and John Doe Defendant "1" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Premiata-MS that were not compensable under the No-Fault Laws.

259.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $3,300.00 pursuant to the fraudulent bills submitted by Premiata-MS, Pritchep, and John Doe Defendant "1" through Premiata-MS. The chart annexed hereto as Exhibit "3" sets forth a representative sample of the fraudulent claims that have been identified to-date that were submitted to GEICO through Premiata-MS.

260.    The extensive fraudulent conduct by Premiata-MS, Pritchep, and John Doe Defendant "1" demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

261.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## EIGHTH CAUSE OF ACTION
### Against Premiata-MS, Pritchep, and John Doe Defendant "1"
### (Unjust Enrichment)

262.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

263.    As set forth above, Premiata-MS, Pritchep, and John Doe Defendant "1" engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

264. When GEICO paid the bills and charges submitted by or on behalf of Premiata-MS for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the improper, unlawful, and/or unjust acts Premiata-MS, Pritchep, and John Doe Defendant "1".

265. Premiata-MS, Pritchep, and John Doe Defendant "1" have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Premiata-MS, Pritchep, and John Doe Defendant "1" voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

266. Premiata-MS, Pritchep, and John Doe Defendant "1"'s retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

267. By reason of the above, Premiata-MS, Pritchep, and John Doe Defendant "1" have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $3,300.00.

## NINTH CAUSE OF ACTION
### Against Wentworth, F. Zadarenok, and John Doe Defendant "1"
### (Common Law Fraud)

268. GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

269. Wentworth, F. Zadarenok, and John Doe Defendant "1" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Equipment.

270. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, that Wentworth had a lawful Dealer in Products License

and was entitled to No-Fault Benefits when in fact Wentworth was not lawfully licensed as it knowingly falsified the business owner information on its application for a Dealer in Products license; (ii) in every claim, that the Fraudulent Equipment dispensed was for reasonable and medically necessary DME when in fact the Fraudulent Equipment was dispensed pursuant to an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols; (iii) in every claim, that the Fraudulent Equipment dispensed pursuant to a legitimate prescription from a licensed healthcare provider, when in fact the Fraudulent Equipment was dispensed based on prescriptions secured through collusive arrangements with the John Doe Defendants; and (iv) in every claim, that the Fraudulent Equipment provided to the Insureds accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when, to the extent that any Fraudulent Equipment was actually provided, the Fraudulent Equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO.

271.    Wentworth, F. Zadarenok, and John Doe Defendant "1" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Wentworth that were not compensable under the No-Fault Laws.

272.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $156,000.00 pursuant to the fraudulent bills submitted by Wentworth, F. Zadarenok, and John Doe Defendant "1" through Wentworth. The chart annexed hereto as Exhibit "1" sets forth a representative sample of the fraudulent claims that have been identified to-date that were submitted to GEICO through Wentworth.

273.    The extensive fraudulent conduct by Wentworth, F. Zadarenok, and John Doe Defendant "1" demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

274.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## TENTH CAUSE OF ACTION
### Against Wentworth, F. Zadarenok, and John Doe Defendant "1"
### (Unjust Enrichment)

275.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

276.    As set forth above, Wentworth, F. Zadarenok, and John Doe Defendant "1" engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

277.    When GEICO paid the bills and charges submitted by or on behalf of Wentworth for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the improper, unlawful, and/or unjust acts Wentworth, F. Zadarenok, and John Doe Defendant "1".

278.    Wentworth, F. Zadarenok, and John Doe Defendant "1" have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Wentworth, F. Zadarenok, and John Doe Defendant "1" voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

279.    Wentworth, F. Zadarenok, and John Doe Defendant "1"'s retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

280.    By reason of the above, Wentworth, F. Zadarenok, and John Doe Defendant "1" have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $156,000.00.

**ELEVENTH CAUSE OF ACTION**
**Against Diamant Plus, Rincon, and John Doe Defendant "1"**
**(Common Law Fraud)**

281.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

282.    Diamant Plus, Rincon, and John Doe Defendant "1" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Equipment.

283.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, that Diamant Plus had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact Diamant Plus was not lawfully licensed as it knowingly falsified the business owner information on its application for a Dealer in Products license; (ii) in every claim, that the Fraudulent Equipment dispensed was for reasonable and medically necessary DME when in fact the Fraudulent Equipment was dispensed pursuant to an insurance fraud scheme that was designed and implemented to exploit the patients for financial gain so as to benefit the Defendants and others not presently known, without regard for genuine patient care, and included dispensing Fraudulent Equipment that was not medically necessary and prescribed pursuant to predetermined fraudulent protocols; (iii) in every claim, that the Fraudulent Equipment dispensed pursuant to a legitimate prescription from a licensed healthcare provider, when in fact the Fraudulent Equipment was dispensed based on prescriptions secured through collusive

arrangements with the John Doe Defendants; and (iv) in every claim, that the Fraudulent Equipment provided to the Insureds accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when, to the extent that any Fraudulent Equipment was actually provided, the Fraudulent Equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO.

284.    Diamant Plus, Rincon, and John Doe Defendant "1" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Diamant Plus that were not compensable under the No-Fault Laws.

285.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $99,000.00 pursuant to the fraudulent bills submitted by Diamant Plus, Rincon, and John Doe Defendant "1" through Diamant Plus. The chart annexed hereto as Exhibit "4" sets forth a representative sample of the fraudulent claims that have been identified to-date that were submitted to GEICO through Diamant Plus.

286.    The extensive fraudulent conduct by Diamant Plus, Rincon, and John Doe Defendant "1" demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

287.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### TWELFTH CAUSE OF ACTION
**Against Diamant Plus, Rincon, and John Doe Defendant "1"**
**(Unjust Enrichment)**

288.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

289.    As set forth above, Diamant Plus, Rincon, and John Doe Defendant "1" engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

290.    When GEICO paid the bills and charges submitted by or on behalf of Diamant Plus for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the improper, unlawful, and/or unjust acts Diamant Plus, Rincon, and John Doe Defendant "1".

291.    Diamant Plus, Rincon, and John Doe Defendant "1" have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Diamant Plus, Rincon, and John Doe Defendant "1" voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

292.    Diamant Plus, Rincon, and John Doe Defendant "1"'s retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

293.    By reason of the above, Diamant Plus, Rincon, and John Doe Defendant "1" have been unjustly enriched in an amount to be determined at trial, but in no event less than the total sum of $99,000.00.

## JURY DEMAND

294.    Pursuant to Federal Rule of Civil Procedure 38(b), GEICO demands a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a Judgment be entered in their favor:

A.    On the First Cause of Action against the Provider Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that the Provider

Defendants have no right to receive payment for any pending bills submitted to GEICO through BNT-AMS, Premiata-MS, Wentworth, and Diamant Plus;

B.      On the Second Cause of action against V. Zadarenok, Pritchep, F. Zadarenok, Rincon and John Doe Defendant "1", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $415,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.      On the Third Cause of Action against the Paper Owner Defendants and the John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but more than $415,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.       On the Fourth Cause of action against V. Zadarenok and John Doe Defendant "1", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $156,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

E.      On the Fifth Cause of Action against BNT-AMS, V. Zadarenok, and John Doe Defendant "1", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $156,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

F.      On the Sixth Cause of Action against BNT-AMS, V. Zadarenok and John Doe Defendant "1", more than $156,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

G.      On the Seventh Cause of Action against Premiata-MS, Pritchep, and John Doe Defendant "1", compensatory damages in favor of GEICO in an amount to be determined at trial

but in excess of $3,300.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

       H.     On the Eighth Cause of Action against Premiata-MS, Pritchep, and John Doe Defendant "1", more than $3,300.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

       I.     On the Ninth Cause of Action against Wentworth F. Zadarenok, and John Doe Defendant "1", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $156,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

       J.     On the Tenth Cause of Action against Wentworth, F. Zadarenok, and John Doe Defendant "1", more than $156,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

       K.     On the Eleventh Cause of Action against Diamant Plus, Rincon, and John Doe Defendant "1", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $99,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

       L.     On the Twelfth Cause of Action against Diamant Plus, Rincon, and John Doe Defendant "1", more than $99,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

Dated:  October 14, 2025
       Uniondale, New York

RIVKIN RADLER LLP


By:   /s/ *Barry Levy*

    Barry I. Levy, Esq.
    Michael Vanunu, Esq.
    Thomas Paddock, Esq.
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*